SOUTHERN DISTRICT OF MISSISSIPPI
F I L E D

JAN 26 2011

J. T. NOBLIN, CLERK
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

CHANNEL CONTROL MERCHANTS, LLC                        **PLAINTIFF**

vs.                                      CIVIL ACTION NO.: 2:11cv21-KS-MTP

STEVE DAVIS, FRANK E. BREAZEALE,
NICHOLAS SHATTLES, BILLY C. HUDSON,
SR. AND BDS HUDSON COMPANY, LLC
d/b/a HUDSON'S OUTLET                                 **DEFENDANTS**

## COMPLAINT

COMES NOW Channel Control Merchants, LLC, and alleges the following against Steve Davis, Frank E. Breazeale, Nicholas Shattles, Billy C. Hudson, Sr. and BDS Hudson Company, LLC d/b/a Hudson's Outlet.

### INTRODUCTION

This is an action for declaratory and injunctive relief, and for compensatory and punitive damages, to remedy Defendants Davis', Breazeale's and Shattles' unlawful violation of employment-related agreements; Defendant Hudson, Sr.'s unlawful inducement of Davis, Breazeale and Shattles to breach those employment-related agreements; and Defendants' unlawful taking and use of Channel Control Merchants' confidential and proprietary trade secrets and other protected business information.

Among other things, Defendants' activities constitute violations of the Federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030; violations of the Mississippi Uniform Trade Secrets Act, Miss. Code Ann. § 75-26-1 *et seq.*; trespass to chattels, conversion, breach of contract, inducement to breach contract and tortious interference with contractual relations, breach of duty of good faith and loyalty, unfair competition, tortious interference with actual and prospective business relations, and civil conspiracy under Mississippi law. Further, Defendants

1

communicated false and misleading representations or descriptions of fact regarding Channel Control Merchants' business and regarding Defendants' business which violated the Federal Lanham Act, 15 U.S.C. § 1125.

## PARTIES

1.     Channel Control Merchants, LLC ("CCM") is a Mississippi limited liability company authorized to do business and presently doing business in the State of Mississippi. CCM maintains its corporate headquarters and regularly conducts business in Forrest County, Mississippi.

2.     Steve Davis ("Davis") is an adult resident citizen of the State of Mississippi presently residing at 711 Jessamine Street, Ellisville, Mississippi  39437.

3.     Frank E. ("Eddy") Breazeale ("Breazeale") is an adult resident citizen of the State of Mississippi presently residing at 47 Cinnamon Fern, Hattiesburg, Mississippi 39042.

4.     Nicholas ("Nick") Shattles ("Shattles") is an adult resident citizen of the State of Mississippi presently residing at 3037 Mesa Drive, Hattiesburg, Mississippi 39402.

5.     Billy C. Hudson ("Hudson, Sr.") is an adult resident citizen of the State of Mississippi presently residing at 27 Troon Circle, Hattiesburg, Mississippi 39401.

6.     BDS Hudson Company, LLC d/b/a Hudson's Outlet ("BDS Hudson") is a Mississippi limited liability company that is authorized to do business and is presently doing business in Forrest County, Mississippi.  BDS Hudson's registered agent for service of process is Billy C. Hudson, 27 Troon Circle, Hattiesburg, Mississippi 39401.

## JURISDICTION

7.     This Court has original subject matter jurisdiction of this civil action under 28 U.S.C. § 1331.  Some of CCM's claims arise under the Computer Fraud and Abuse Act, 18

U.S.C. § 1030, and the Lanham Act, 15 U.S.C. § 1125.  This Court has supplemental jurisdiction of the state-law claims asserted pursuant to 28 U.S.C. § 1367

      8.     This Court has personal jurisdiction over Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson.

**VENUE**

      9.     Venue is proper in this Court because a substantial part of the events giving rise to CCM's claims took place in the Southern District of Mississippi.

**SUMMARY OF FACTS**

**History of Channel Control Merchants, LLC**

      10.    CCM's business operations include purchasing insurance salvage merchandise and reselling it at deeply discounted prices primarily through CCM's Treasure Hunt retail stores. CCM's business operations also include purchasing close-outs, customer returns and other secondary market merchandise and reselling it at deeply discounted prices primarily through CCM's Dirt Cheap retail stores.

      11.    CCM owns and operates a total of fifty-eight (58) retail stores in Mississippi, Louisiana and Alabama.  CCM also owns and operates seven warehouses/distribution centers in Mississippi.  CCM employs approximately one thousand three-hundred eighty-five employees (1,385) in Mississippi, Louisiana and Alabama.

      12.    Prior to 1995, Hudson, Sr. owned a substantial interest in and served on the Board of Directors and as Chief Executive Officer for Hudson Salvage, Inc., the predecessor in interest to CCM.

      13.    In January 1995, Hudson, Sr. ceased his service on both the Board of Directors and as the Chief Executive Officer of Hudson Salvage, Inc.  Over the next two years, Hudson,

3

Sr. divested himself of his ownership interest in Hudson Salvage, Inc. Hudson, Sr. has not been materially involved in the insurance salvage business since the last of his ownership interest was sold on or about January 15, 1997. After that date, Hudson's son, Bill Hudson, Jr., ("Hudson, Jr.") became the majority owner and Chief Executive Officer of Hudson Salvage, Inc.

14.     In November 2002, Robert Aaron Roberts ("Roberts") began working as an independent contractor with Hudson Salvage, Inc. In the fall of 2003, Hudson, Jr. sold Roberts and other investors a majority interest in the Dirt Cheap retail operations and a minority interest in the Treasure Hunt retail operations. Roberts became the Chief Executive Officer of Dirt Cheap and Hudson, Jr. retained his title as Chief Executive Officer of Treasure Hunt.

15.     In the summer of 2006, a decision was made to merge the Treasure Hunt and Dirt Cheap retail operations. Effective upon the date of that merger, the Treasure Hunt and Dirt Cheap operations were owned by a holding company titled Hudson Holdings, LLC. After that merger, Roberts and Hudson, Jr. acted as Co-Chief Executive Officers of the combined companies.

16.     In January 2008, Hudson, Jr. resigned his position as Co-Chief Executive Officer but remained on the Board of Directors of Hudson Holdings, LLC. As sole Chief Executive Officer, Roberts was responsible for both Treasure Hunt and Dirt Cheap retail operations. Under Roberts' direction, the company focused on continuing the expansion of Dirt Cheap retail operations and on expanding potential supply sources for Treasure Hunt retail operations.

17.     Roberts encouraged certain employees of Treasure Hunt - including Davis, Breazeale and Shattles - to expand their skill sets and to prepare themselves to take on new responsibilities for the benefit of the company. For example, CCM paid for Breazeale and Shattles to complete their college educations.

4

18.     Between 2003 and December 2009, Hudson, Jr. sold portions of his ownership interest in Hudson Holdings, LLC, to Roberts and other owners through multiple transactions.

19.     In December 2009, Hudson, Jr. sold his remaining ownership interest in Hudson Holdings, LLC, to Roberts and other current owners, and Roberts and those owners became the majority owners of CCM and its various subsidiaries.

20.     Concurrent with Hudson, Jr.'s sale of his ownership interest, Roberts agreed to change the name of Hudson Holdings, LLC, and its various operating subsidiaries to remove the name "Hudson's."

21.     In March 2010, Hudson's Holdings, LLC, changed its name to Channel Control Merchants, LLC.  Although CCM retained its rights to trademarks that contained the "Hudson's" name, including "Hudson's Treasure Hunt" and "Hudson's Dirt Cheap," the company's various subsidiaries made similar name changes.  For example, Hudson's Treasure Hunt began to operate under the name Treasure Hunt and Hudson's Dirt Cheap began to operate under the name Dirt Cheap.

**The Insurance Salvage Merchandise Business**

22.     Insurance salvage merchandise is only available when an insured casualty loss event (such as a fire or flood) occurs.  The insurance salvage industry is a unique business in that an unpredictable but finite amount of merchandise is available in any given calendar year.

23.     The business is also unique because the sale of salvage merchandise after an insured casualty loss is managed by a small group of companies called "salvors."  Salvors essentially act as agents for the insurance company and, in some cases, the insured to manage mitigation of damages when a casualty loss event occurs.

24.     There are a relatively small number of salvage retailers in the country.  Salvage retailers such as CCM compete with each other to purchase the finite amount of available salvage merchandise from salvors.  Knowledge of the salvors' identity is vital to the success of a salvage retail business.  The insurance salvage industry does not offer a trade directory or other method of easily ascertaining the identity of salvors.  Instead, the knowledge can only be acquired through long-term discovery and networking.

25.     Because of the geographically diverse locations of salvors and the geographically diverse locations of insured casualty losses, the business of buying insurance salvage merchandise requires a nationwide focus.  For example, during 2010, only three percent (3%) of salvage inventories purchased by CCM arose from insurance losses in the three states (Mississippi, Louisiana and Alabama) where CCM operates retail stores.  The balance of the salvage inventories CCM purchased were from other states.

26.     Over the course of many years and at great expense, CCM developed a Customer List that lists each company that sells insurance salvage and other secondary market inventory.  CCM's Customer List contains information such as the company name, one or more individual contacts' names, business and home addresses, business, home and cellular telephone numbers, and e-mail addresses.  This directory is not reproducible with publicly available information.

27.     CCM's Customer List is highly confidential and CCM takes steps to protect its security.  For example, the Customer List is password protected and only active Buyers and upper level executives of CCM have access to the Customer List.  Moreover, CCM has a Confidentiality Policy that all employees are required to acknowledge and abide by.

28.     CCM has invested a considerable amount of time and resources developing and maintaining its relationships and goodwill with salvors.  These relationships are vital to the success of CCM's business.

### Davis', Breazeale's and Shattles' Employment History With CCM

29.     Davis was employed by CCM and its predecessor in interest from September 1995 until September 8, 2010.  Davis began his tenure as an Assistant Manager of a Treasure Hunt retail store.  Davis received several promotions to positions with increasingly higher levels of trust and responsibility.  In December 2009, Davis held the position of Buyer.

30.     Breazeale was employed by CCM and its predecessor in interest from December 1997 until September 8, 2010, with a few breaks in service.  Breazeale began his tenure as a Warehouse Associate.  Breazeale received several promotions to positions with increasingly higher levels of trust and responsibility.  In December 2009, Breazeale held the position of Buyer.

31.     Shattles was employed by CCM and its predecessor in interest from February 2002 until September 8, 2010.  Shattles began his tenure as a shipping/receiving associate and received several promotions to positions with increasingly higher levels of trust and responsibility.  In December 2010, Davis held the position of Buyer.

### Davis', Breazeale's and Shattles' Ownership History

32.     Employee ownership in CCM is not offered as a matter of course.  Rather, the opportunity to purchase ownership interests and receive the associated distributions is considered a privilege, and is only offered to employees with a long history of service or employees CCM believes have a bright future with the company and hold a position that positively affects revenues.

33.     In July 2003, Davis became an owner of Hudson Associates of Hattiesburg, LLC, which changed its name to CCM Associates of Hattiesburg, LLC, in March 2010.   CCM Associates of Hattiesburg, LLC, owns an interest in CCM.  CCM and its owners provided Davis non-recourse loans so he could purchase the ownership interest.  During the time period that Davis was an owner, Davis received approximately $324,648 in distributions in addition to the salary and bonus payments he received as an employee.

34.     In January 2006, Breazeale became an owner of Hudson Associates of Hattiesburg, LLC, which changed its name to CCM Associates of Hattiesburg, LLC in March 2010.  CCM Associates of Hattiesburg, LLC, owns an interest in CCM.  CCM provided Breazeale with a non-recourse loan so he could purchase the ownership interest.  During the time period that Breazeale was an owner, Breazeale received approximately $40,586 in distributions in addition to the salary and bonus payments he received as an employee.

35.     In July 2003, Shattles became an owner of Hudson Associates of Hattiesburg, LLC, which changed its name to CCM Associates of Hattiesburg, LLC, in March 2010.  CCM Associates of Hattiesburg, LLC, owns an interest in CCM.  CCM and its owners provided Shattles non-recourse loans so he could purchase the ownership interest.  During the time period that Shattles was an owner, Shattles received approximately $39,861 in distributions in addition to the salary and bonus payments he received as an employee.

### Davis', Breazeale's and Shattles'
### Non-Compete, Non-Solicitation and Confidentiality Agreements

36.     In connection with and in consideration of their purchase of ownership interests in Hudson Associates of Hattiesburg, LLC, the predecessor in interest to CCM Associates of Hattiesburg, LLC, Davis, Breazeale and Shattles each entered into a Non-Compete and

8

Confidentiality Agreement in which they agreed that, for a period of two (2) years following the date they ceased to be an employee, they would not:

(a) Compete with the Companies, directly nor indirectly;

(b) Participate in any capacity whatsoever in a business that would directly or indirectly compete with the Companies, including, without limitation, as an executive, director, officer, employer, employee, principal, agent, fiduciary, administrator of another's property, principal, agent, associate, general partner, independent contractor, franchiser, franchisee, distributor or consultant; or

(c) Have any interest whatsoever in such an enterprise, including without limitation, as owner, shareholder, partner, limited partner, lender or silent partner.

37.    A true and correct copy of the Non-Compete and Confidentiality Agreement executed by Davis is attached hereto as Exhibit A.  A true and correct copy of the Non-Compete and Confidentiality Agreement executed by Breazeale is attached hereto as Exhibit B.  A true and correct copy of the Non-Compete and Confidentiality Agreement executed by Shattles is attached hereto as Exhibit C.

38.    In their agreements, Davis, Breazeale and Shattles also agreed, for a period of two (2) years following the date they ceased to be an employee:

(a) Not to solicit suppliers of the Companies, directly or indirectly, not to permit the use of his name in order to solicit such suppliers or do anything whatsoever to induce or lead any person to decide to put an end, in whole or in part, to any business relations with the Companies; and

(b) Not to induce, attempt to induce or otherwise solicit the personnel of the Companies neither to leave their employment with the Companies nor to hire the personnel of the Companies for any enterprise in which Employee has an interest.

See Exhibits A, B and C.

39.    In their agreements, Davis, Breazeale and Shattles further agreed to maintain the secrecy of CCM's Confidential Information:

> 5. Confidential Information. Employee agrees that during the period that he is an employee of the Companies and thereafter he shall hold in a fiduciary capacity for the benefit of the Companies all secret or confidential information, knowledge, or data relating to the Companies or their businesses (which shall be defined as all such information, knowledge and data coming to Employee's attention by virtue of his employment with the Companies, or any predecessor employer, except that which is otherwise public knowledge or known within the Companies' industries). During such period, Employee shall not, without the prior written consent of the Companies, unless compelled pursuant to an order of a court or other body having jurisdiction over such matter and unless required by lawful process or subpoena, communicate or divulge any such information, knowledge or data to anyone other than the Companies and those designated by it.

*See* Exhibits A, B and C.

40.     The Non-Compete and Confidentiality Agreements cited above were of vital importance to CCM.  Davis, Breazeale and Shattles' execution of the Non-Compete and Confidentiality Agreements was a material inducement for CCM to permit Davis, Breazeale and Shattles to purchase ownership interests in Hudson Associates of Hattiesburg, LLC, the predecessor in interest to CCM Associates of Hattiesburg, LLC.  Davis', Breazeale's and Shattles' agreements to abide by the Non-Compete and Confidentiality Agreement constituted consideration for CCM to permit Davis, Breazeale and Shattles to purchase ownership interests in Hudson Associates of Hattiesburg, LLC, the predecessor in interest to CCM Associates of Hattiesburg, LLC.

41.     In addition to the Non-Compete and Confidentiality Agreements, CCM's personnel policies (and those of CCM's predecessor in interest) contain a confidentiality policy that requires all employees to refrain from disclosing CCM's confidential information.

42.     Further, as described more particularly intra, in connection with their effort to purchase the company, Davis, Breazeale and Shattles each executed separate Confidentiality/Release of Information and Confidential Business Information policies with

10

Confidentiality/Release of Information and Confidential Business Information policies with similar restrictions.

### Breazeale's, Davis' and Shattles' Positions and Responsibilities

43.     Davis, Breazeale and Shattles had no experience in or knowledge about the salvage industry prior to their employment by CCM and its predecessor in interest.  Solely because of that employment, they acquired substantial and unique training, skills and experience in the salvage industry.  Every contact they made in the insurance salvage business came as a result of their employment by CCM and CCM's significant investments in building relationships in the industry.

44.     More particularly, as Buyers, Davis, Breazeale and Shattles traveled to insurance salvage loss locations and met salvors to remove salvage inventory purchased and coordinate its shipment to CCM's distribution facility.  They were required to remain at the loss location for a period of time that ranged from several days to weeks.  During their stay, Buyers typically spent a significant amount of time with and entertained the salvor and other important contacts involved in the purchase.

45.     In connection with their position, Davis, Breazeale and Shattles were introduced to companies and individuals that specialize in handling loss claims related to damaged merchandise for insureds.  As described above, these contacts are invaluable in the salvage business.

46.     Because of the significant amount of confidential and proprietary information CCM shared with Davis, Breazeale and Shattles, and because of their significant and prolonged contact with those companies and individuals that specialize in handling loss claims related to

damaged merchandise for insureds, the non-compete, non-solicitation and confidentiality agreements Davis, Breazeale and Shattles agreed to be bound by are vital to the protection of CCM's legitimate business interests.

**Davis', Breazeale's and Shattles' Sale of Interest In CCM
and Declining Work Performance**

47.    In March 2010, in connection with his earlier purchase of Hudson's Jr.'s interest in CCM, Roberts made an offer to all employee owners of CCM Associates of Hattiesburg, LLC, to purchase some or all of the ownership interests in CCM Associates of Hattiesburg, LLC, on the same terms as those offered to Hudson, Jr.  This offer was in keeping with past practice whereby Roberts and Hudson, Jr. would offer to purchase employee ownership interests on the same terms when they traded interests with each other.

48.    Soon thereafter, Davis, Breazeale and Shattles began to communicate by e-mail regarding their intent to sell their ownership interests in CCM Associates of Hattiesburg, LLC.

49.    On April 28, 2010, Davis, Breazeale and Shattles sold all of their ownership interest in CCM Associates of Hattiesburg, LLC and withdrew from CCM Associates of Hattiesburg, LLC.

50.    Approximately one month later, CCM's phone records show at least nineteen (19) calls between Davis' CCM-issued cellular telephone and Hudson, Sr.'s telephone.  The first three (3) calls were initiated from Hudson, Sr.'s telephone.  Of a total of nineteen (19) telephone calls between May 28, 2010, and July 7, 2010, twelve (12) were initiated by Hudson, Sr. and seven (7) were initiated by Davis.  Upon information and belief, during these calls, Hudson, Sr. took steps to induce Davis, Breazeale and Shattles to go into the insurance salvage business with him.

51.    Prior to Hudson, Sr.'s acts to induce Davis, Breazeale and Shattles to go into the insurance salvage business with him, Breazeale and Davis had contemplated undertaking several

business ventures, such as investing in real estate, operating a website that tracked students' sports activities and developing inventions such as a heated thermos. A significant amount of Breazeale's and Davis' planning for these ventures took place during working hours utilizing CCM-issued e-mail accounts and other CCM resources.

52.     Notably, none of these business ventures would have resulted in a breach of Breazeale's and Davis' Non-Compete and Confidentiality Agreements.

53.     By the middle of 2010, the work performance of several CCM Buyers had deteriorated to an unacceptable level. For example, and particularly after the sale of their ownership interests in CCM Associates of Hattiesburg, LLC, Davis, Breazeale and Shattles frequently came to the office late, left in the middle of the day ostensibly for personal reasons and left the office early.

54.     After Hudson, Jr. sold his interest to Roberts, Hudson, Sr. began to make disparaging remarks about Roberts and CCM. For example, in early 2010, Hudson, Sr. entered the Hattiesburg Treasure Hunt store and spoke with Carolyn Russell, the long-time store manager. Hudson, Sr. told Russell that he was angry that Hudson, Jr. had sold the business and advised Russell that he was contemplating starting a new company. Hudson, Sr. told Russell that he did not want to "leave [her] with a Canadian," a reference to Roberts' heritage. During the same conversation, Hudson, Sr. attempted to gauge Russell's interest in leaving CCM's employment and working for him in the insurance salvage business.

55.     Around May 2010, Roberts learned that Hudson, Sr. was also attempting to induce Davis to leave CCM and join Hudson, Sr. in forming a competing salvage business.

56.     In late June 2010, Roberts invited Davis to accompany him and other CCM management officials on a business trip to Santiago, Chile, to research potential expansion into

13

the Chilean retail market.  Roberts hoped that the trip would energize Davis with regard to the career growth opportunities available to him with CCM and result in improved job performance.

57.     While in Chile, Davis shared certain information with Roberts about Davis,' Breazeale's and Shattles' behavior during buying and pack up trips.  The information Davis shared caused Roberts concern about Davis', Breazeale's and Shattles' activities and job performance while traveling on CCM business.  Roberts also became concerned that their behavior could damage CCM's relationships with individuals from whom CCM purchases inventory.

58.     When he returned from Chile, Roberts began to observe Davis', Breazeale's and Shattles' work performance more closely and became even more concerned about the employees' work ethic and failure to accomplish several important assignments.  Around this time, Roberts also learned that some office employees had a pool as to whether Davis, Breazeale or Shattles would be the first to leave on a particular work day.

59.     In late July, Breazeale approached Rick Shadix ("Shadix"), a senior officer of CCM, to inquire whether Roberts would be interested in selling the Treasure Hunt business operation to Breazeale and other employees.  Breazeale asked Shadix not to share this information with Roberts.  However, Shadix was concerned about Breazeale's loyalty and dedication to CCM and shared Breazeale's overture with Roberts.

60.     At this point, Roberts' concerns over Davis', Breazeale's and Shattles' loyalty and long-term commitment to CCM had reached a critical level.  As a result, on August 17, 2010, Roberts convened a meeting with the Buyers (other than Breazeale) to discuss unacceptable job performance and his expectations for improvement.

61.     At the end of the meeting, Roberts gave the Buyers two options: (i) they could improve their performance, or (ii) if they believed they could run the Treasure Hunt operation better than current management, they could make CCM an offer to purchase that operation. (Breazeale was not present for the meeting, but the information was relayed to him.)

62.     On August 18, 2010, Breazeale informed Roberts that he, Shattles and Davis intended to make an offer to purchase the Treasure Hunt operation.

63.     By choosing to make a purchase offer rather than committing to improve their work performance, Davis, Breazeale and Shattles effectively resigned from their employment with CCM.

64.     Other Buyers employed by CCM and present for the meeting chose to commit to improving their performance. Those other Buyers are still employed by CCM.

65.     Roberts planned to individually discuss with Breazeale, Shattles and Davis their behavior while on CCM business trips. However, Davis, Breazeale and Shattles chose to resign from CCM and make an offer to purchase the Treasure Hunt operations before Roberts had an opportunity to do so.

### Davis', Breazeale's and Shattles' Offer To Purchase Treasure Hunt

66.     In connection with formulating the offer to purchase CCM's Treasure Hunt operations, Roberts informed Davis, Breazeale and Shattles of the specific financial information CCM would provide and that the group was only permitted to speak to Roberts or Rick Preusch (the company's chief financial officer) regarding that financial information. In addition, CCM and Davis, Breazeale and Shattles entered into a Confidentiality Agreement on August 20, 2010, in which they agreed to keep the negotiations and all information provided in connection with

the negotiations strictly confidential. A true and correct copy of the Confidentiality Agreement is attached hereto as Exhibit D.

67.     In addition, Roberts reiterated the existence and contents of Davis', Breazeale's and Shattles' Non-Compete and Confidentiality Agreements to Davis, Breazeale and Shattles on multiple occasions. Roberts made it abundantly clear that CCM expected Davis, Breazeale and Shattles to abide by the Non-Compete and Confidentiality Agreements if the negotiations did not result in a sale of the business.

68.     CCM proceeded with the offer process and provided Davis, Breazeale and Shattles with confidential and proprietary financial information under the assumption that if CCM and Davis, Breazeale and Shattles did not consummate a deal, Davis, Breazeale and Shattles would abide by the terms of the Non-Compete and Confidentiality Agreements they executed.

69.     Had CCM known that, if a purchase was not consummated, Davis, Breazeale and Shattles would not abide by the terms of the Non-Compete and Confidentiality Agreements they executed and that Davis, Breazeale and Shattles would actually begin operating a competing business, CCM would not have proceeded with the negotiations or provided Davis, Breazeale and Shattles with its confidential and proprietary financial information.

70.     An e-mail exchange between Davis, Breazeale and Shattles reflects that, on August 19, 2010, Davis, Breazeale and Shattles traveled together to Purvis, Mississippi, where Hudson, Sr. maintains a business and/or a residence. There was no legitimate business reason for Davis, Breazeale and Shattles to travel to Purvis, Mississippi that day. Upon information and belief, Davis, Breazeale and Shattles traveled to Purvis, Mississippi, to discuss their offer to

16

purchase the Treasure Hunt operation with Hudson, Sr. or to otherwise make plans to compete with CCM.

71.     On August 19, 2010, Breazeale asked Donna Ladner, one of CCM's records coordinators, for information regarding Treasure Hunt store inventory.  Breazeale told Ladner that he needed the information for a deal he was working on.  As instructed by Breazeale, Ladner downloaded the requested information from CCM's proprietary inventory and sales control software, compiled it into an Excel file, and e-mailed it to Breazeale as he requested.

72.     The information Breazeale requested was not the information CCM agreed to provide Davis, Breazeale and Shattles in connection with their offer to purchase.  Moreover, Ladner was not one of the individuals from whom Davis, Breazeale and Shattles were authorized to obtain purchase-related information.  Furthermore, Breazeale was not working on any deal for which the information was relevant.

73.     The information Breazeale obtained is so sensitive and confidential that access to the database is highly restricted through passwords and other means, and CCM shreds paper documents containing the information after each executive review meeting.

74.     On August 21, 2010, Roberts presented Davis, Breazeale and Shattles with a memorandum, confirming their decision to make an offer to purchase the Treasure Hunt operation.  He also confirmed that Davis, Breazeale and Shattles were effectively resigning by choosing to make a purchase offer.

75.     On August 23, 2010, Roberts and three other senior officers of CCM met with Davis, Breazeale and Shattles.  Roberts offered each of them an opportunity to change their mind regarding the offer to purchase.  When Davis, Breazeale and Shattles confirmed their intent to

move forward with an offer to purchase, Roberts informed them that there was no reason to continue coming to the office and that they should utilize their time to work on the offer.

76.     At that time, CCM collected Davis', Breazeale's and Shattles' company property. Breazeale said that he would provide CCM with the company property in his possession first because he knew that the request to return company property was coming and that he had been in the office on Saturday, August 21, 2010 to gather his belongings.

77.     On August 30, 2010, Davis, Breazeale and Shattles made an offer to purchase the Treasure Hunt Operations which was unreasonable and predictably unacceptable. Nevertheless, on September 3, 2010, CCM made a counter-offer. On September 8, 2010, Davis, Breazeale and Shattles declined that counter-offer. Since that date, Davis, Breazeale and Shattles have made no further attempt to negotiate a purchase of the Treasure Hunt Operations.

78.     Davis', Breazeale's and Shattles' last day of employment with CCM was September 8, 2010.

## Formation and Opening of Hudson's Outlet

79.     On September 16, 2010, only eight days after the last day of Davis', Breazeale's and Shattles' employment with CCM. Hudson, Sr. filed a certificate of formation for BDS Hudson Company, LLC. Upon information and belief, BDS stands for "Breazeale, Davis and Shattles."

80.     On September 29, 2010, Breazeale contacted Bobby Lee ("Lee"), a longtime employee of CCM. Breazeale knew that Lee previously built clothing racks for CCM's use. Breazeale asked Lee if he would agree to build clothing racks for Breazeale's use in his "new store." When Lee informed Breazeale that he no longer built clothing racks, Breazeale asked Lee to reveal CCM's source for obtaining clothing racks. Lee refused.

81.     In late September 2010, CCM learned that Davis, Breazeale, Shattles and Hudson, Sr. were calling on and marketing their new business to the salvors with whom Davis, Breazeale and Shattles developed relationships during their employment by CCM and from whom CCM purchased salvage merchandise.

82.     Davis, Breazeale, Shattles and Hudson, Sr. made untrue statements to these salvors to the effect that CCM was no longer interested in the salvage industry.  These false statements had the capacity to seriously injure CCM's relationship with the salvors and to damage CCM's ability to compete for purchasing salvage merchandise.

83.     Davis, Breazeale, Shattles and Hudson, Sr. have also made untrue statements to the public to the effect of CCM was getting out of the salvage business.  For example, Breazeale, Shattles, Davis and Hudson, Sr. told the individual from whom they leased warehouse space that CCM was getting out of the salvage business and that Breazeale, Shattles, Davis and Hudson, Sr. were going to fill a niche left by CCM.

84.     On October 5, 2010, Roberts sent an e-mail to Davis, Breazeale, Shattles and Hudson, Sr. reiterating that Davis, Breazeale and Shattles entered into contracts that contained non-compete, non-solicitation and confidentiality provisions.

85.     In November 2010, Davis, Breazeale, Shattles and Hudson, Sr. began operating Hudson's Outlet at 99 Braswell Road, Hattiesburg, Mississippi.  Hudson's Outlet operates in direct competition with CCM's Treasure Hunt operation for both the purchase and sale of insurance salvage merchandise.

86.     In November 2010, Hudson, Sr. spoke with local media.  As a result of those media contacts, WDAM reported to the public regarding the opening of Hudson's Outlet's. Specifically, it was reported that a 60-year old company is bringing its name and retail goods

19

back to Hattiesburg, that "Hudson's" has opened a new store in Hattiesburg, and that the "new wave of stores comes with 3 new partners, to bring back the original concept of Hudson's." Hudson Sr.'s statements were the proximate cause of and intentionally made to give the public the false impression that BDS Hudson, rather than CCM, was the original predecessor in interest to the Hudson's Salvage franchise.

87.     "Hudson's Treasure Hunt" and "Hudson's Dirt Cheap" did business using those store names for an extended period of time before they began doing business as simply "Treasure Hunt" and "Dirt Cheap" in or around April 2010.  The general public associates the Hudson's name with those stores.  The name "Hudson's Outlet" gives a false impression that "Hudson's Outlet" is an outlet store for CCM's Treasure Hunt and Dirt Cheap operations or that "Hudson's Outlet" is otherwise connected with CCM's Treasure Hunt and Direct Cheap operations.

88.     Moreover, numerous CCM customers have been confused about the merchandise available for purchase at CCM stores due to advertisements of "Hudson's Outlet."

89.     Hudson, Sr. has made malicious references to the public about CCM and its Treasure Hunt and Dirt Cheap operations.  By way of example, Hudson, Sr. has said that CCM is owned by "foreigners."   Hudson, Sr. has made numerous references to Roberts as "the Canadian."  Hudson, Sr. has also made malicious comments such as it is terrible that CCM is now owned by a Canadian, that Roberts is running the company into the ground, and that Roberts and his team do not know how to make money.

**Misappropriation of Confidential and Proprietary Information**

90.     After CCM learned of Davis', Breazeale's, Shattles' and Hudson, Sr.'s intention to open a competing business, CCM retained a forensic expert to examine computer hard drives issued by CCM to Davis, Breazeale and Shattles.

91.     The forensic examination revealed that, early in the morning on August 23, 2010, Breazeale's last day with access to CCM's computers and computer system, Breazeale misappropriated CCM's confidential, proprietary information, including information that Breazeale obtained from Ladner. Upon information and belief, Breazeale also misappropriated data from CCM's proprietary software that tracks inventory and sales. Breazeale e-mailed this information from his CCM e-mail address to a personal e-mail address (eddybreazeale@gmail.com).

92.     The forensic examination also revealed that Breazeale inserted an external memory device (commonly referred to as a "thumb drive") into his CCM-issued laptop on several occasions leading up to August 23, 2010, and on the morning of August 23, 2010. CCM does not provide such devices to its employees to use. CCM never authorized Breazeale to utilize an external memory device on his CCM-issued computer.

93.     The confidential information Breazeale e-mailed to his personal address gives Davis, Breazeale, Shattles and Hudson, Sr. a significant and unfair competitive advantage. By way of example, specific information concerning the profitability of each Treasure Hunt store was contained in the information Breazeale e-mailed to his personal address. Upon information and belief, through use of the data taken from CCM by Breazeale, Hudson's Outlet publicized its intent to open a store in each of the four geographic locations where Treasure Hunt's most profitable stores are located.

94.     The forensic examination further revealed that Breazeale downloaded an Internet-based file synchronization application designed to allow files and folders between two or more computers to synchronize with each other and to enable remote desktop access via the Internet. Beginning on July 29, 2010, Breazeale attempted on multiple occasions to synchronize his

personal computer with his CCM-issued computer and thereby gain access to all of the information available on his CCM-issued computer through his home computer.

95.     The forensic examination also revealed that Breazeale downloaded an electronic copy of CCM's Customer List onto an external memory storage data device on July 14, 2010.

96.     CCM's forensic investigation into Davis', Breazeale's and Shattles' computer hard-drives and CCM-issued e-mail accounts is ongoing.

97.     Davis, Breazeale and Shattles were provided hard-copies of CCM's Customer List that was updated in 2010.  Davis, Breazeale and Shattles did not return this confidential, proprietary information to CCM when their employment ended.  This proprietary, confidential information gives Breazeale, Shattles, Davis and Hudson, Sr. a significant and unfair competitive advantage.  Davis, Breazeale, Shattles and Hudson, Sr. would not have the information necessary to solicit salvors without the Customer List.

98.     Upon information and belief, Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson also misappropriated information regarding salvor activity and information tracking bids that CCM made during the last year.  Upon information and belief, Breazeale sent this information to a second personal e-mail address (eddyb170@hotmail.com).

99.     CCM is aware of at least three purchases of salvage merchandise Davis, Breazeale, Shattles and Hudson, Sr. made since opening Hudson's Outlet, we well as several solicitation attempts to purchase insurance salvage.  All three purchases were from salvors on CCM's Customer List, were salvors from whom CCM purchases inventory, and were salvors with whom Davis, Breazeale and Shattles developed relationships as a direct result of their employment by CCM.

22

**COUNT ONE**

*Computer Fraud And Abuse Act, 18 U.S.C. §1030(a)(2)*

100.   CCM incorporates by reference the preceding averments of its Complaint.

101.   CCM's computers and computer systems, including without limitation its computer servers, are used in interstate commerce or communication and are "protected computers" under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(2).   By way of example only, CCM's computers are connected to and utilize the internet, CCM's employees utilize CCM's computers and computer systems to communicate with business contacts across state-lines via electronic mail, and Davis, Breazeale and Shattles utilized CCM-issued laptop computers to conduct business while traveling in different states.

102.   Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, intentionally accessed CCM's protected computers without authorization and/or in excess of authorization to observe, copy, download, print, collect or otherwise obtain confidential, private, trade secret and/or protected information and data for their benefit.

103.   By accessing CCM's protected computers to observe, copy, download, print, collect or otherwise misappropriate confidential, private, trade secret and/or protected information and data for their benefit, Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson compromised and/or impaired the integrity of such information and data.

104.   Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, accessed CCM's protected computers and computer systems in violation of the Confidentiality Agreement that Davis, Breazeale and Shattles executed and in violation of CCM's Confidentiality policy.

105.    Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's access to CCM's computers without authorization and/or in excess of authorization constituted violations of CCM's rights by wrongful and dishonest means, methods or schemes.

106.    CCM has been required to spend substantial time and money to investigate and respond to the Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's access of CCM's protected computers and computer systems, including, but not limited to, CCM's employees' time to assess and respond to such actions and the retention of a computer forensic expert and other professionals to perform a forensic examination and assessment of the protected computers and computer systems. Such sums have exceeded $5,000.00. CCM continues to incur costs as forensic examination and other professional examinations of the protected computers and computer systems is ongoing.

107.    Almost all computer communications over the Internet are interstate in nature. As but one example, computer communications between a laptop computer in Mississippi and a computer server in another state involve interstate communication.

108.    Davis, Breazeale, Shattles, Hudson, Sr., and BDS Hudson directly or through their agents, intentionally accessed a computer without authorization and/or in excess of authorized access and thereby obtained information from a protected computer by conduct that involved an interstate communication.

109.    Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, caused a "loss," as that term is defined in the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(11), to CCM of more than $5,000 in value during any one-year period, thus implicating the factors set forth in 18 U.S.C. §1030(a)(5)(B)(i).

110.    Davis' Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's actions constitute a violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2), and CCM is entitled to all damages permitted by 18 U.S.C. § 1030.

## COUNT TWO

*Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4)*

111.    CCM incorporates by reference the preceding averments of its Complaint.

112.    By the actions alleged above, Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, knowingly and with intent to defraud, accessed CCM's protected computers and computer systems, without authorization and/or in excess of authorized access.

113.    By the actions alleged above, Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, furthered the intended fraud and obtained unauthorized use of CCM's protected computers and computer systems, obtained things of value, and caused a "loss," as that term is defined in the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(11), to CCM of more than $5,000 in value during any one-year period, thus implicating the factors set forth in 18 U.S.C. § 1030(a)(5)(B)(i).

114.    Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's activity constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(4), and CCM is entitled to all damages permitted by 18 U.S.C. §1030.

## COUNT THREE

*Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)*

115.    CCM incorporates by reference the preceding averments of its Complaint.

116.    By the actions alleged above, Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, knowingly and intentionally accessed CCM's protected computers and knowingly caused the transmission of a program, information, code, or command, without authorization and/or in excess of authorized access, and as a result of such conduct, intentionally caused damage.

117.    By the actions alleged above, Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, intentionally accessed CCM's protected computers without authorization and, as a result of such conduct, intentionally caused damage, recklessly caused damage, or simply caused damage as the term "damage" is defined in the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(8).

118.    By the actions alleged above, Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, caused a "loss," as that term is defined in the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(e)(11), to CCM of more than $5,000 in value during any one-year period, thus implicating the factors set forth in 18 U.S.C. § 1030(a)(5)(B)(i).

119.    Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's activity constitutes a violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5) and CCM is entitled to all damages permitted by 18 U.S.C. § 1030.

## COUNT FOUR

### *Trespass to Chattels*

120.    CCM incorporates by reference the preceding averments of its Complaint.

121.    CCM's computers and computer systems, including without limitation its computer servers, and documents and electronically stored information (hereinafter "ESI") therein are the personal property of CCM.

122.     Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, misappropriated non-public documents and ESI from CCM's files and computers systems.

123.     Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson were aware that their actions were specifically prohibited by the Confidentiality Agreements Davis, Breazeale and Shattles executed and by CCM's Confidentiality policy and/or were on notice that their actions were not authorized by CCM.

124.     Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, directly or through their agents, have knowingly, intentionally and without authorization used and intentionally trespassed upon CCM's property.

125.     Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's trespass on CCM's property was willful, malicious, oppressive, and in wanton and conscious disregard of CCM's rights.  CCM is, therefore, entitled to an award of punitive damages to punish their wrongful conduct and to deter future wrongful conduct.

126.     As a result of Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's wrongful and unlawful actions, CCM has been damaged in an amount to be proven at trial.

## COUNT FIVE

*Lanham Act*

127.     CCM incorporates by reference the preceding averments of its Complaint.

128.     Davis, Breazeale, Shattles, Hudson, Sr., and BDS Hudson, through their agents and representatives, made false or misleading representations and descriptions of facts and false or misleading representations of fact, which are likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association of CCM and its services and

commercial activities. The false or misleading representations of facts or descriptions of facts include, but are not limited to, statements to the effect that CCM is no longer interested in the salvage industry, CCM is owned by "foreigners" and was purchased by an "overseas company," and that BDS Hudson is the original predecessor in interest to the Hudson's Salvage franchise.

129.    The acts and omissions of Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson constitute violations of the Lanham Act, 15 U.S.C. § 1125.

## COUNT SIX

*Misappropriation of Trade Secrets*

130.    CCM incorporates by reference the preceding averments of its Complaint.

131.    During their employment with CCM, Davis, Breazeale and Shattles gained knowledge of and access to confidential and proprietary information, including trade secrets of CCM.

132.    Davis, Breazeale and Shattles were under a duty to maintain the secrecy and limit the use of CCM's trade secrets to legitimate and authorized purposes.

133.    Davis, Breazeale and Shattles disclosed, and/or, in the alternative, inevitably in the future will disclose, CCM's trade secrets in violation of law, including the Mississippi Trade Secrets Act, Miss. Code Ann. § 75-26-1 et seq.

134.    Davis, Breazeale and Shattles engaged in "improper means" with respect to their access to and use of CCM's trade secrets, as that term is defined by Miss. Code Ann. § 75-26-3.

135.    Davis, Breazeale and Shattles engaged in "misappropriation" with respect to CCM's trade secrets, as that term is defined by Miss. Code Ann. § 75-26-3.

136.    The confidential and proprietary information misappropriated by Davis, Breazeale and Shattles, including CCM's Customer List and financial information, derives independent

value from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. Furthermore, the confidential and proprietary information misappropriated by Davis, Breazeale and Shattles, including CCM's Customer List and financial information, has been the subject of efforts reasonable under the circumstances to maintain its secrecy.

137.    Hudson, Sr. and BDS Hudson have obtained and used CCM's trade secrets from Davis, Breazeale and Shattles, knowing or having reason to know that the trade secrets were obtained by improper means.

138.    Such conduct by Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson amounts to a willful, wanton and, in the alternative, reckless violation of Mississippi law.

139.    Davis, Breazeale, Shattles Hudson, Sr. and BDS Hudson are liable to CCM for all remedies and damages available under the Mississippi Trade Secrets Act, including those authorized by Miss. Code Ann. § 75-26-7 (1972).

## COUNT SEVEN

### *Conversion*

140.    CCM incorporates by reference the preceding averments of its Complaint.

141.    Davis, Breazeale, Shattles, Hudson, Sr., and BDS Hudson, directly or through their agents, intentionally and wrongfully interfered with and converted CCM's personal property without lawful justification and they have put such property to unauthorized uses, as a result of which CCM has been deprived of possession and use of its property.

142.    Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's conversion of CCM's property was willful, malicious, oppressive, and in wanton and conscious disregard of CCM's rights.

## COUNT EIGHT

*Breach of Contract (Non-Compete and Confidentiality Agreement)*

143.    CCM incorporates by reference the preceding averments of its Complaint.

144.    Davis, Breazeale and Shattles each entered into Non-Compete and Confidentiality Agreements.  Each agreed to abide by the terms of those contracts for a period of two (2) years immediately following the date they left employment with CCM.  See Exhibits A, B and C.

145.    Davis, Breazeale and Shattles: (i) are directly competing with CCM in the insurance salvage business via their employment by, association with and/or ownership of BDS Hudson, (ii) solicited CCM's suppliers to do business with BDS Hudson and end their relationship in whole or in part with CCM, (iii) misappropriated CCM's confidential information and used that information for their own benefit or the benefit of a third party, and (iv) solicited CCM's personnel to leave their employment with CCM or attempted to hire CCM personnel to perform work for BDS Hudson.

146.    Davis', Breazeale's and Shattles' actions and omissions constitute breach of contract.

## COUNT NINE

*Breach of Contract (Confidentiality Agreements)*

147.    CCM incorporates by reference the preceding averments of its Complaint.

148.    Davis, Breazeale and Shattles entered into a Confidentiality Agreement in connection with their negotiations to purchase the Treasure Hunt operation.  See Exhibit D.

149.    Davis, Breazeale and Shattles breached that Confidentiality Agreement by utilizing the confidential, proprietary information CCM provided to them in reliance on that

Confidentiality Agreement and in connection with their negotiations to purchase the Treasure Hunt operations for their own benefit and to compete with CCM.

## COUNT TEN

### *Breach of Implied Covenant of Good Faith and Fair Dealing*

150.    CCM incorporates by reference the preceding averments of its Complaint.

151.    CCM entered into negotiations with Davis, Breazeale and Shattles to sell CCM's Treasure Hunt operations and CCM agreed to provide Davis, Breazeale and Shattles with CCM's confidential, proprietary financial information under the assumption that Davis, Breazeale and Shattles were proceeding with those negotiations in good faith and with a real intent to attempt to purchase the Treasure Hunt operations.

152.    CCM entered into negotiations with Davis, Breazeale and Shattles to sell CCM's Treasure Hunt operations and CCM agreed to provide Davis, Breazeale and Shattles with its confidential, proprietary financial information under the assumption if the deal was not consummated, Davis, Breazeale and Shattles would abide by the Non-Compete and Confidentiality Agreements they executed and under the assumption that Davis, Breazeale and Shattles would abide by the Confidentiality Agreement they executed in connection with the negotiations.

153.    Davis, Breazeale and Shattles did not make a good faith offer to purchase CCM's Treasure Hunt operations and, upon information and belief, never intended for a deal to be consummated.

154.    Davis', Breazeale's and Shattles' actions and omissions constitute a breach of duty of good faith and fair dealing.

31

## COUNT ELEVEN

*Inducement To Breach Contract And Tortious Interference With Contractual Relations*

155.    CCM incorporates by reference the preceding averments of its Complaint.

156.    Hudson, Sr. contacted Davis while Davis was an employee of CCM and subject to a non-compete, non-solicitation and confidentiality agreement with CCM and intentionally and willfully induced Davis to breach his non-compete, non-solicitation and confidentiality agreement and go into business with Hudson, Sr. in the insurance salvage industry.

157.    Moreover, Hudson, Sr. knew that Davis, Breazeale and Shattles had non-compete, non-solicitation and confidentiality agreements no later than October 5, 2010, but Hudson, Sr. continued to intentionally and willfully induce Davis, Breazeale and Shattles to breach their non-compete, non-solicitation and confidentiality agreement and go into business with Hudson, Sr. in the insurance salvage industry.

158.    Hudson, Sr. induced Davis, Breazeale and Shattles to go into the insurance salvage business with him.

159.    Hudson, Sr. knew or should have known that Davis, Breazeale and Shattles entered into a Confidentiality Agreement in connection with their negotiations to purchase the Treasure Hunt operations.  Hudson, Sr. induced Davis, Breazeale and Shattles to share and utilize the confidential, proprietary financial information CCM provided to Davis, Breazeale and Shattles so that Breazeale, Shattles, Davis, Hudson, Sr. and BDS Hudson could compete with CCM.  Hudson, Sr. thereby induced Davis, Breazeale and Shattles to breach the Confidentiality Agreement.

160.    Hudson, Sr.'s actions were clearly calculated to cause damage to CCM in the operation of its lawful business given the remarks Hudson, Sr. made about CCM, Roberts'

heritage and his desire to compete with CCM for an improper reason. Moreover, Hudson, Sr.'s actions were clearly calculated to cause damage to CCM in the operation of its lawful business given that Hudson, Sr. knew Davis, Breazeale and Shattles were employed by CCM in roles that were vital to the success of its business and that, as a result of their positions, they had significant contacts with salvors and others in the insurance salvage business. Hudson, Sr.'s actions were done with the unlawful purpose of causing damage and actual damages and losses have resulted from this malicious conduct.

161. Hudson, Sr.'s acts and omissions constitute inducement to breach a contract and tortious interference with contractual relations.

## COUNT TWELVE

### *Breach Of Duty Of Good Faith And Loyalty*

162. CCM incorporates by reference the preceding averments of its Complaint.

163. While employed by CCM, Davis, Breazeale and Shattles owed a duty of loyalty and good faith to CCM.

164. Davis', Breazeale's and Shattles' duty of loyalty and good faith included, but was not limited to, the following:

a. refraining from self-dealing;

b. avoiding and disclosing potential conflicts of interest; and

c. refraining from misappropriating, disclosing or soliciting the misappropriation or disclosure of confidential and proprietary information and trade secrets of CCM.

165. Davis', Breazeale's and Shattles' actions and failures constitute breaches of Breazeale's, Shattles' and Davis' duty of loyalty and good faith to CCM.

33

## COUNT THIRTEEN

*Unfair Competition and Tortious Interference With Actual And Prospective Business Relations*

166.    CCM incorporates by reference the preceding averments of its Complaint.

167.    Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson acted with a malicious or unlawful purpose and to intentionally and wrongfully damage the existing and future business operations of CCM.

168.    The acts and omissions of Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson constitute actionable predatory practices and unfair competition.

169.    The acts and omissions of Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson constitute tortious interference with actual and prospective advantageous business relations of CCM.

## COUNT FOURTEEN

*Constructive Trust/Unjust Enrichment*

170.    CCM incorporates by reference the preceding averments of its Complaint.

171.    CCM and its predecessor in interest allowed Davis, Breazeale and Shattles to obtain an ownership interest in Hudson Associates of Hattiesburg, LLC, later renamed CCM Associates of Hattiesburg, LLC, because Davis, Breazeale and Shattles agreed to abide by the terms of the Non-Compete and Confidentiality Agreement they executed.

172.    Davis, Breazeale and Shattles received the benefit of their bargain and were paid substantial dividends as a result of their ownership interest in Hudson Associates of Hattiesburg, LLC, later renamed CCM Associates of Hattiesburg, LLC.  Davis, Breazeale and Shattles also profited from their sale of their ownership interest in Hudson Associates of Hattiesburg, LLC, later renamed CCM Associates of Hattiesburg, LLC.

173.    Davis, Breazeale and Shattles breached the Non-Compete and Confidentiality Agreements they executed and thereby deprived CCM and its predecessor in interest of the benefit of its bargain.

174.    Davis, Breazeale and Shattles were unjustly enriched and should be ordered to disgorge all profits they received as a result of their ownership interest in Hudson Associates of Hattiesburg, LLC, later renamed CCM Associates of Hattiesburg, LLC.

## COUNT FIFTEEN

### *Civil Conspiracy*

175.    CCM incorporates by reference the preceding averments of its Complaint.

176.    Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson willfully, knowingly, and intentionally agreed and conspired with each other for the purpose of engaging in unlawful conduct, for unlawful purposes, including acts of violation of the Computer Fraud and Abuse Act, violation of the Lanham Act, misappropriation of trade secrets, conversion, inducement to breach contract and tortious interference with contractual relations, breach of contract, breach of duty of good faith and loyalty, and unfair competition and interference with actual and prospective business relations, and for the purpose of engaging in both otherwise lawful and unlawful conduct by wrongful conduct and means.

177.    Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson committed the acts alleged pursuant to, and in furtherance of, that agreement and furthered the conspiracy by cooperating, encouraging, ratifying, or adopting the acts of the others.

178.    As a direct and proximate result of the acts in furtherance of the conspiracy, CCM has suffered injury, damage, loss, and harm.  The wrongful conduct committed pursuant to the conspiracy was a substantial factor in causing this harm.

179.    Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's intentional agreement to commit, and the commission of, these wrongful acts was willful, malicious, oppressive, and in wanton and conscious disregard of CCM's rights.  CCM is, therefore, entitled to an award of punitive damages to punish their wrongful conduct and to deter future wrongful conduct.

## VICARIOUS LIABILITY

### *Bases for Vicarious Liability*

180.    CCM incorporates by reference the preceding averments of its Complaint.

181.    Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson are each vicariously liable for all their respective wrongful acts and omissions alleged herein under the doctrines of: respondeat superior; conspiracy; aiding and abetting; agency; joint venture; co-adventure; and/or joint tortfeasor.

## PRAYER FOR RELIEF AND AD DAMNUM

182.    CCM demands and is entitled to a judgment from and against Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson, jointly and separately, as follows:

   a.    such actual damages to which CCM may prove its entitlement before this Court;

   b.    liquidated damages as provided for in the Non-Compete and Confidentiality Agreement executed by Davis, Breazeale and Shattles;

   c.    the imposition of a constructive trust on Davis', Breazeale's and Shattles' Hudson, Sr.'s and BDS Hudson's ill-gotten gains, as well as an award and order of disgorgement related to Davis', Breazeale's, Shattles', Hudson, Sr.'s and BDS Hudson's unjust enrichment;

   d.    the return of all dividends paid to Davis, Breazeale and Shattles as a result of their ownership of Hudson Associates of Hattiesburg, LLC, later renamed CCM Associates of Hattiesburg, LLC;

36

e.   punitive or exemplary damages in a sum sufficient to punish Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson for the willful, wanton and wrongful conduct, as well as to make an example of Davis, Breazeale, Shattles, Hudson, Sr. and BDS Hudson for the societal purpose of deterrence;

f.   prejudgment and post-judgment interest;

g.   attorneys' and expert witness fees, expenses and costs;

h.   declaratory and injunctive relief; and

i.   such further damages or other relief to which CCM may be justly entitled for the injuries, losses, abuses and injustices it has suffered.

WHEREFORE, PREMISES CONSIDERED, Channel Control Merchants, LLC prays that the Court will award Channel Control Merchants, LLC the relief requested. Channel Control Merchants, LLC further prays for any and all other equitable, general or specific relief as may be appropriate and just.

THIS the 26th day of January 2011.

CHANNEL CONTROL MERCHANTS, LLC

By: _____

JEFFREY A. WALKER (MB No. 6879)
ALISON TASMA VANCE (MB No. 101113)

ATTORNEYS FOR CHANNEL CONTROL
MERCHANTS, LLC

OF COUNSEL:

BUTLER, SNOW, O'MARA, STEVENS
  & CANNADA, PLLC
1020 Highland Colony Parkway, Suite 1400 (39157)
Post Office Box 6010
Ridgeland, MS  39158-6010
T (601) 985-4415
F (601) 985-4500
jeff.walker@butlersnow.com
alison.vance@butlersnow.com

James Kelly Dukes
Dukes Dukes & Wood
226 W. Pine Street
Hattiesburg, MS 39401-3825
P O Box 2055
Hattiesburg, MS 39403-2055
Telephone: (601) 544-4121
Fax: (601) 544-4425
E-mail: jdukes@jdukeslaw.com

Jackson 5955641v1